```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
JAMES BARRY,                             :
                                         :
                    Plaintiff,           :
                                         :    09 Civ. 8805 (DLC)
              -v-                        :
                                         :       OPINION & ORDER
CITY UNIVERSITY OF NEW YORK; HUNTER      :
COLLEGE; Director of Human Resources     :
ROBERT McGARRY; ANAND PADMANABHAN,       :
Chief Information Officer; and           :
the CITY OF NEW YORK,                    :
                                         :
                    Defendants.          :
                                         :
-----------------------------------------X
```

Appearances:

For Plaintiff:

Andrew J. Schatkin
Law Offices of Andrew J. Schatkin
350 Jericho Turnpike
Jericho, NY 11753

For the City University of New York and Hunter College:

Clement John Colucci, III
New York State Department of Law
120 Broadway, 24th Floor
New York, NY 10271

DENISE COTE, District Judge:

Plaintiff James Barry ("Barry" or "plaintiff") brings this lawsuit alleging age discrimination and intentional infliction of emotional distress against the City of New York, the City University of New York ("CUNY"), Hunter College ("Hunter"), Robert McGarry ("McGarry"), and Anand Padmanabhan

("Padmanabhan").  On February 4, 2010, defendants City University of New York and Hunter College (collectively, "CUNY")[1] filed a motion to dismiss Barry's amended complaint.[2]  For the following reasons, CUNY's motion is granted in its entirety.

## BACKGROUND

The following facts are drawn from the plaintiff's January 26, 2010 amended complaint (the "Complaint") and are assumed to be true for the purposes of deciding this motion.  Barry is employed by Hunter, a college within the CUNY system.  McGarry and Padmanabhan were, throughout most of the events giving rise to this litigation, the Director of Human Resources and Chief Information Officer, respectively, at Hunter.

The plaintiff started at Hunter in January 1981, when he was hired to work as a Computer Operator to manage the college's data processing needs.  Barry's job classification in this role

---

[1] Hunter, as a senior college within the CUNY system, has no separate legal existence from CUNY.  See N.Y. Educ. Law §§ 6202(5), 6203.  Therefore, all claims asserted against Hunter will be treated as claims against CUNY.  See Clissuras v. City Univ. of N.Y., 359 F.3d 79, 81 n.2 (2d Cir. 2004) (per curiam).

[2] The City of New York has not yet filed a responsive pleading.  According to counsel for CUNY, the two individual defendants, Padmanabhan and McGarry, have not yet been served with the amended complaint.  A scheduling Order of December 21, 2009 set a February 5, 2010 deadline for service of the plaintiff's amended pleading.  The plaintiff does not contest that he failed to serve the individual defendants.  As a result, all claims against the individual defendants will be dismissed as well.

2

was Assistant to Higher Education Officer ("aHEO").[3]  In 1984, because of Barry's outstanding job performance, he was transferred from an evening shift to a daytime position as Production Control Coordinator.  The plaintiff's responsibilities in this second position grew over time: in 1984, there were three coordinators, but after several years, Barry became the sole coordinator, assuming the workloads of the two other employees who had left.  In 1995, Barry became Telecommunications Coordinator.

In his current role as Help Desk Manager, a position he has held since 1998, Barry performs a variety of supervisory and administrative tasks within Hunter's Instructional Computing and Information Technology ("ICIT") department.  As manager of the help desk, which is the "central point of contact for reporting technology problems" for users at various campuses, he receives more than 3,500 requests for troubleshooting and repair assistance each year, which he then assigns among a staff of technicians.  Barry is also responsible for managing more than 2,000 faculty and staff members' computers, more than any other ICIT employee maintains; in this role, Barry upgrades computer software and hardware and receives users' questions and

---

[3] In its motion to dismiss, CUNY explains that it employs the following hierarchy of titles, from lowest to highest: aHEO; Higher Education Assistant ("HEa"); Higher Education Associate ("HE Associate"); and Higher Education Officer ("HEO").

3

requests, which amount to 40-50 inquiries per day.  Barry also "reports and maintains records pertaining to the transfer and disposal of computer equipment" so that ICIT's inventory records are accurately maintained.  Barry also is responsible for various seasonal or intermittent responsibilities, such as distributing and installing computer equipment for new incoming faculty, maintaining the online staff and faculty directories, and communicating with outside vendors concerning special maintenance requests.  The foregoing list is an illustrative, but not exhaustive, catalogue of Barry's job responsibilities.

     Barry is still classified as an aHEO -- the same title he held in 1981 -- and he asserts that he is entitled to have his title reclassified to HEa.  Barry states that he has been an employee of Hunter "with 28 years of continuous, outstanding, and dedicated service to the college."  Moreover, the scope of his duties has grown considerably over the years, with steadily increasing responsibility for managerial work.  As supervisor of the help desk for the past seven years, Barry alleges that he now has nine employees under his management and direction.  Barry also asserts that he has received excellent work reviews: in his most recent performance evaluation, he received the highest rating in every category, and in January 2006, Barry received the "HEO Award" for outstanding service.  Finally, Barry notes that, in 2002, he assumed the responsibilities of a

co-worker whose title was HE Associate, which is two titles above Barry's current title. Barry maintains that all requirements for reclassification imposed by the University have been satisfied.

Barry's attempts to achieve reclassification have thus far proven unsuccessful. Barry alleges that he was recommended for reclassification by two supervisors, Padmanabhan and Mark Watters ("Watters"), Director of User Services, in about 2004. After no further communication from Watters or Padmanabhan concerning reclassification for over a year, Barry was instructed in August 2005 to speak with McGarry, the human resources director, to seek an explanation for the delay. McGarry told Barry that CUNY had a policy of not reclassifying IT staff unless the staffperson "work[s] in an academic department and spend[s] more than 50% of [his or her] time doing 'IT work.'"

Barry thereafter spoke with Leo Deuster, a union representative ("Deuster"). Deuster advised Barry to send a letter to Padmanabhan and Watters requesting that a formal reclassification process be initiated. Barry did so in October 2005. Receiving no response, Barry again contacted Deuster in late November 2005, at which time Deuster advised him that "if his job duties had increased by at least 30%, [he] should submit information to the Labor Management Committee at Hunter

5

College." Barry submitted this information to the Labor Management Committee (the "LMC") on December 7, 2005. Included in these papers was a description of Barry's work history at Hunter, an explanation of how Barry's responsibilities had grown over the past five years, a list of reasons why the plaintiff should be promoted, and a statement that Watters supported his request. Watters followed up by sending an email to the head of the LMC on January 30, 2006 explaining the growth in Barry's job responsibilities.

Barry's application for reclassification thereafter began to proceed favorably. On March 8, 2006, Barry received notice from the LMC that "steps had been taken for papers to be sent to [the] HEO Screening Committee for approval." The HEO Screening Committee approved Barry's reclassification request on June 9, 2006. At that point, McGarry informed Barry that the next step would be "approval from 80th Street," which McGarry said "usually happens within fifteen business days."[4]

Final approval was not forthcoming, however. Instead, throughout the summer, Barry and McGarry exchanged various emails concerning the status of Barry's reclassification request, and McGarry made inquiries with central management on Barry's behalf. In July, Padmanabhan left CUNY for a position

---

[4] The phrase "80th Street" in the Complaint is construed as a reference to CUNY's Office of Human Resources Management, which is located on East 80th Street in Manhattan.

6

at another university.  Then, on August 9, McGarry emailed Watters to note that, according to the most recent organizational chart available to human resources, Barry was supervising only two people, both of whom were college assistants.  Watters responded by identifying eight staff members who were supervised by Barry.  McGarry further inquired whether Barry conducted their performance evaluations; Watters replied that the plaintiff completed four of the evaluations himself, but that Watters assisted Barry in completing three others.  One week later, on August 16, McGarry ceased responding to Barry's email status inquiries.

Throughout that autumn, Barry did not receive formal approval for reclassification.  On December 4, 2006, however, Padmanabhan's successor sent Barry a letter with benefits and salary information for "Computer Systems Manager" positions.  One of these positions was then offered to Barry under a "Provisional title."  Barry was told that if he accepted this position, he would no longer be a member of the union and would yield certain benefits.  Barry consulted with a representative at the PSC[5] concerning this proposal and explained to her that he felt pressured to accept the provisional job instead of pursuing the HEa title.  The PSC representative responded that that was

---

[5] The term "PSC" in the Complaint is construed as a reference to the Professional Staff Congress, a union at CUNY.

7

possibly a violation of applicable labor agreements and regulations.

On January 3, 2007, the PSC filed a Step I Grievance on Barry's behalf to challenge the apparent denial of his reclassification request.  A Step I hearing was held on February 15, 2007, and Barry's grievance was denied on March 20, 2007.  Barry does not state whether he attempted to appeal the denial of his Step I grievance.

In the Complaint, the plaintiff asserts that the denial of his request for reclassification amounted to unlawful age discrimination.  Barry alleges that similar reclassifications were approved for at least six other employees in his department based upon those employees' increased workloads, with at least four of the promotions occurring over the past year and given to individuals under thirty-five-years old.  The plaintiff asserts that he is similarly situated to these other individuals insofar as they are also union members, "[t]hey all do the same work [as] the plaintiff," and "there is no differentiation in their duties."  Barry also alleges that the criteria employed during his reclassification application process differed from those used for others.  For example, Barry was asked what percentage of time he spent doing "instructional duties," which none of the others promoted in ICIT were required to address.  Barry also appears to allege that CUNY officials were willfully or

8

negligently ignorant of the plaintiff's steady increase in workload and duties.  As a result of his failure to be reclassified, Barry maintains that he has been "working out of title for the past five years."

## DISCUSSION

CUNY has moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1).  "Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  Id. (citation omitted).  In general, "[t]he court must take all facts alleged in the complaint as true," but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  Id. (citation omitted).

Defendant CUNY contends that its state sovereign immunity under the Eleventh Amendment bars plaintiff from obtaining relief against it in federal court.  While the Eleventh

9

Amendment by its terms does not bar suits against a state by its own citizens, the Supreme Court has held that a non-consenting state is also immune from suits brought against it in federal court by its own citizen.  See Alden v. Maine, 527 U.S. 706, 713 (1999) (noting that the concept of "Eleventh Amendment immunity" is "convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment").

Three main exceptions to the doctrine of state sovereign immunity exist.  First, sovereign immunity may be voluntarily waived by the state, "as when the state itself brings a federal suit or removes a case from state to federal court."  In re Deposit Ins. Agency, 482 F.3d 612, 617 (2d Cir. 2007).  Second, Congress may abrogate states' Eleventh Amendment immunity by "'unequivocally express[ing]'" its intent to abrogate that immunity through legislation "enacted 'pursuant to a valid grant of congressional authority.'"  Id. (quoting Tennessee v. Lane, 541 U.S. 509, 517 (2004)).  A final, narrow exception to state sovereign immunity is set forth in Ex Parte Young, 209 U.S. 123 (1908), which held that the Eleventh Amendment does not bar suits seeking prospective injunctive relief against state officials acting in violation of federal law because that conduct is not considered state action.

State sovereign immunity not only extends to the state itself, but to state agencies that constitute "arms of the State." N. Ins. Co. of N.Y. v. Chatham County, Ga., 547 U.S. 189, 193 (2006). To determine whether a state agency can be properly characterized as an "arm of the state," courts must analyze "(1) the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity, and (2) the degree of supervision exercised by the state over the defendant entity." Clissuras, 359 F.3d at 82 (citation omitted).

The question of whether CUNY constitutes an "arm of the state" -- at least insofar as the conduct in question relates to a "senior college" such as Hunter -- was decisively settled in Clissuras. The Clissuras court found that "the state is responsible for paying money judgments entered against CUNY senior colleges" and that "ultimate control over how CUNY is governed and operated rests with the state." Id. (citation omitted). The court thus concluded that while "CUNY senior colleges certainly do have a degree of independence, . . . they are ultimately accountable to, and dependent upon, the state." Id. at 83 (citation omitted).

Plaintiff's arguments to the contrary are plainly without merit. Barry contends that CUNY is not an "arm of the state" because "[t]he City of New York has a significant role in the

11

governance and operation of the CITY University," including the mayor's role in conducting general oversight and in appointing five of the seventeen CUNY trustees.  Barry further argues that "since the City of New York [is] fully involved with the State in the administration and funding of the City University, the Eleventh Amendment immunity cannot be asserted against the State, and [thus] both the city and the State should be held liable for the ADEA violation."

Plaintiff's theory was expressly rejected by the Court of Appeals in Clissuras, and he advances no good-faith argument for why that holding should not continue to apply.  Nor does plaintiff cite any authority for the proposition that the "interstricably [sic] intertwining character of the relationship between City and State in this case" should estop CUNY from asserting its immunity.

Moreover, the plaintiff has not identified any exception to state sovereign immunity that would permit his claims to proceed against CUNY.  This is not surprising.  For example, the Supreme Court held in Kimel v. Fla. Bd. of Regents, 528 U.S. 62 (2000), that the ADEA was not a valid abrogation of states' sovereign immunity under Congress's Fourteenth Amendment enforcement powers.  Id. at 91.  Likewise, the Eleventh Amendment "bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court."  Raygor v. Regents of the

12

Univ. of Minn., 534 U.S. 533, 540-41 (2002) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 120 (1984)). Consequently, each of plaintiff's claims against CUNY is barred by state sovereign immunity and must be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

## CONCLUSION

CUNY's February 4, 2010 motion to dismiss is granted in its entirety. The claims against both individual defendants are dismissed for failure to serve them by February 5, 2010.

SO ORDERED:

Dated: New York, New York
       March 30, 2010

_____
DENISE COTE
United States District Judge